IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Manly Howell Hook, )<br> Plaintiff, )<br> )<br> vs. )<br> )<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br> )<br> Defendant. )<br>_____ ) | Civil Action No. 6:14-1311-TMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on June 22, 2009, alleging that he became unable to work on January 1, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On August 4, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

Thomas C. Neil, an impartial vocational expert, appeared on September 29, 2011, considered the case *de novo*, and on October 13, 2011, issued a decision approving the plaintiff's application for benefits from an amended onset date of May 28, 2009[2] (Tr. 136-46). On October 18, 2012, the Appeals Council reversed the ALJ's decision because it found the ALJ's decision was not supported by substantial evidence (Tr. 147-51, 201-205). The Appeals Council vacated the decision and remanded the case for further proceedings.

On May 29, 2013, the plaintiff and Mary Cornelius, an impartial vocational expert, appeared at a hearing before a different ALJ in Augusta, Georgia (Tr. 109-31). On August 8, 2013, the ALJ issued a decision denying the plaintiff's application for benefits (Tr. 16-30). The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 7, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2)    The claimant has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: degenerative joint disease and obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

_____

[2]At the hearing before the first ALJ, the plaintiff, through his representative, amended the alleged onset date of disability to May 28, 2009 (Tr. 140). In the case before the undersigned, however, the second ALJ considered the plaintiff's claim from his original alleged onset date of disability, January 1, 2009 (Tr. 16-30).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with additional limitations.  The claimant can occasionally climb ramps or stairs, stoop, and balance.  The claimant can do work that does not require him to climb ladders, ropes, or scaffolds, kneel, crouch, or crawl.  The claimant can do work that permits him to avoid concentrated exposure to extreme cold, excessive vibration, unprotected hazards and heights, and driving.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on February 2, 1965, and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2000, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 43 years old on his alleged onset date of disability (Tr. 133). He has a twelfth grade education and past relevant work experience as a clay tester and as a cook (Tr. 271, 274). The plaintiff was fired from his job in January 2009 (Tr. 98-100, 115-16). He did not seek any treatment for his hip until four months later, on May 28, 2009, when he saw R. Vaughan Massie, M.D. At that time, upon physical examination, the plaintiff was 5'6" and weighed 213 pounds. His hip had irritability with rotation and reduced range of motion. His knee had no swelling or point tenderness. The plaintiff was neurovascularly intact. Dr. Massie diagnosed the plaintiff with right hip degenerative joint disease based on an x-ray and "told him that there was not much that can be done other than some mild activity modifications, which the plaintiff has already tried to do . . . because he has been hurting so bad." Dr. Massie gave him a handout on total hip arthroplasty and told the plaintiff that if he wanted to proceed, he should follow up with Drs. Shannon or Holford for further evaluation (Tr. 344).

On September 24, 2009, Robert Kukla, M.D., a state agency physician, reviewed the evidence in connection with the plaintiff's initial application (Tr. 132, 345-52). Dr. Kukla opined that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand and/or walk and sit about six hours in an eight-hour workday. He was limited to occasional push and pull with the right lower extremity. The plaintiff could occasionally climb ramps and stairs, balance, kneel, crouch, and crawl. He could frequently stoop and never climb ladders, ropes, and scaffolds and should avoid all exposure to hazards (Tr. 345-52).

On December 22, 2009, Dr. Massie completed a check-box form indicating that the plaintiff could lift up to twenty pounds occasionally and ten pounds frequently, stand/walk for less than two hours in an eight-hour day, and sit for about six hours in an eight-hour day. The plaintiff was limited in his ability to push and pull with the lower

6

extremities due to severe hip degenerative joint disease.  He further opined that the plaintiff would miss six to ten days of work a month, and the pain in the plaintiff's groin and leg was sufficient to affect his ability to concentrate.  Dr. Massie stated that the plaintiff would need to rest for fifteen to twenty minutes every thirty minutes, and he would need to change position as needed from sitting and/or standing to laying down.  However, Dr. Massie opined that with total hip arthroplasty the plaintiff's prognosis was "good" (Tr. 354-58).

On May 17, 2010, John Nicholson, M.D., consultatively examined the plaintiff at the request of the state agency.  At that time, the plaintiff was taking no medication.  The plaintiff told Dr. Nicholson that he had been told there were not any helpful interventions outside of total hip replacement.  He said he was not interested in surgery and did not have health insurance.  Upon physical examination, the plaintiff's height was approximately 5'5", and his weight was 216 pounds.  Dr. Nicholson found that the plaintiff was obese, had marked loss of motion in his right hip, signs of flattened lumbar lordosis with an inability to flex forward, and an inability to perform a tandem gait, heel gait, or toe gait.  However, the plaintiff had negative straight-leg raising, full strength (except that his resisted hip movements were not tested), intact sensation, a wide-based gait with an antalgic gait pattern, normal thought processes and content, and a normal ability to attend and concentrate.  Dr. Nicholson recommended that the plaintiff consider steroids in his right hip and stated that if there was no improvement, he would need a total hip replacement.  Dr. Nicholson opined that the plaintiff was "unlikely to return to his previous heavy lifting job," but did not place any further restrictions on the plaintiff (Tr. 360-64).

On May 19, 2010, the plaintiff was seen for a hip x-ray at Aiken Regional Medical Center.  The x-ray of his right hip showed severe degenerative changes (Tr. 366).

In June 2010, Dale Van Slooten, M.D., another state agency physician, reviewed the evidence in connection with the plaintiff's request for reconsideration (Tr. 134, 367-74).  He reviewed Dr. Massie's opinion and Dr. Nicholson's opinion and opined that the

7

plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds.  He could stand and walk for two hours and sit for six hours in an eight-hour workday.  He could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch.  He should never crawl or climb ladders, ropes, and scaffolds and should avoid concentrated exposure to hazards due to an antalgic gait (Tr. 367-74).

On September 23, 2010, the plaintiff was seen at the Aiken Regional Medical Center for abdominal pain, at which time he mentioned no hip problems, and a physical examination showed that his extremities were non-tender and had normal range of motion with no edema (Tr. 476-83).  On that same date, the plaintiff underwent a laparoscopic cholecystectomy to remove his gall bladder (Tr. 474-77).

The plaintiff saw a nurse practitioner at the Community Medical Clinic of Aiken County on November 2, 2010, for blood pressure evaluation.  The plaintiff's physical examination showed that he had an unsteady gait due to hip problems, but he had full (5/5) muscle strength and strong pulses in his extremities (Tr. 376).  The nurse practitioner diagnosed the plaintiff with right hip degenerative joint disease and prescribed ibuprofen (Tr. 376).

The plaintiff returned to the nurse practitioner on February 1, 2011.  At that time, the plaintiff reported feeling well.  He reported no complaints and stated that "Ibuprofen [was] helping [his] musculoskeletal pains."  Upon physical examination, the plaintiff's gait was steady and coordinated, and he had full muscle strength.  For his degenerative joint disease, the nurse practitioner continued prescribing ibuprofen (Tr. 377).

At the next three visits, in March, April, and July of 2011, the plaintiff reported "no complaints," and the physical examinations showed no edema and full muscle strength.  The nurse practitioner continued prescribing ibuprofen (Tr. 378-80).  Thereafter, the plaintiff required no further treatment for his hip through the remaining two years of the relevant period, which ended on August 8, 2013, the date of the ALJ's decision.

8

In March and August 2012 and January and February 2013, the plaintiff was treated at the Medical College of Georgia for a large cystic growth on the right posterior side of his head. He also had a left scalp cyst (Tr. 388, 428, 437, 443). On January 10 and 13, 2013, the plaintiff reported to the emergency department at Aiken Regional Medical Center with fluid leakage from a cyst on the right side of his head (Tr. 489, 517). At these visits, the plaintiff did not mention any hip complaints, and physical examinations from those treatment notes show that the plaintiff had no neurological deficits and normal range of motion, normal strength, and no tenderness upon musculoskeletal examination (Tr. 388-91, 515-17).

A repeat x-ray on June 13, 2013, showed moderately severe degenerative changes in the right hip (Tr. 545).

On July 3, 2013, Vasant Garde, M.D., consultatively examined the plaintiff at the request of the state agency (Tr. 548-58). The plaintiff reported hip problems since 2008. The plaintiff said that he had been told the hip was not sitting in the socket properly and would require surgery to fix it. He stated that it hurt to sit, stand or even lie down. The plaintiff reported that the pain had worsened since 2008 and his pain level was a nine out of ten. The plaintiff reported taking only over-the-counter medications, which "help[ed] some" (Tr. 549). Upon physical examination, the plaintiff displayed significant limitation in his range of motion of his hips (Tr. 552). He walked favoring his right leg, "although at a satisfactory pace and without the use of any assistive device" (Tr. 551). He could squat well, he displayed no signs of joint abnormality, his motor function was equal with satisfactory strength, there was no overt atrophy, and his sensation was intact (Tr. 552). He had significant limitation of range of motion in both hips, more pronounced on the right than on the left. He had a positive straight leg raise test bilaterally. When the plaintiff was lying down he always kept his right leg externally rotated at the hip. Dr. Garde's impression was that the plaintiff had chronic, severe right hip pain secondary to degenerative arthritis

9

and pain in the left hip, probably due to arthritis. The plaintiff also had hypertension and was obese.  The plaintiff's range of motion was limited in the hip adduction, flexion, internal rotation, external rotation and extension.  Dr. Garde opined that the plaintiff could occasionally climb, stoop, kneel, crouch, and crawl, and could continuously balance.  He could frequently use his right and left foot.  Dr. Garde stated that the plaintiff could sit for sixty minutes at a time and stand for ten minutes at a time.  He could sit for six hours in a day, he could walk a block, and he could stand for two hours and walk for one hour.  He could frequently lift and/or carry ten pounds (Tr. 549-58).  Dr. Garde completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) in which he opined that the plaintiff could perform a limited range of sedentary work (Tr. 553-58).

### Administrative Hearing

At the administrative hearing on May 29, 2013, the plaintiff reported that his health problems started after a car accident.  A doctor told him that he would need to have a hip replacement to fix his problem.  The plaintiff had not had the surgery because he had heard things that scared him.  He had heard that it might not do much good and he was worried about his age.  The plaintiff testified that he had Medicaid, and that he took only over-the-counter ibuprofen (Tr. 118-19; *see also* Tr. 388, 549).  He had pain while sitting (Tr. 115-19).

The plaintiff lived with his mother, who just had a stroke.  He also lived with his children, aged 12 and 15.  His ex-wife came to his house to help with meals and with caring for his mother.  His ex-wife did the chores and the yard work.  The plaintiff was not able to do much during the day.  He could make himself something to eat.  He tried to do the dishes, but he could not stand for more than about ten minutes.  The plaintiff had not returned to the doctor because he figured they were going to tell him the same thing they had always told him about his hip.  The ALJ noted that a consultative exam had been scheduled and the plaintiff would get a notice in the mail (Tr. 119-122).

The plaintiff testified that the length of time he could sit varied depending on the chair. Sometimes he could sit for an hour or two before he would have to reposition himself. Even when he was lying down he had pain. He reclined off and on during the day to try to keep the pain level down. The plaintiff stated that sitting would cause him pain and it was hard for him to say whether or not he could spend the whole day in a normal, upright, sitting position. The plaintiff reported that he had good days and bad days, and on bad days he did not feel like he could walk (Tr. 123-25).

The ALJ asked the plaintiff if the weather affected his pain. The plaintiff replied that he noticed a little more pain when the weather was cold. The plaintiff was able to drive, but sometimes he had to pull over because of the pain from sitting and the position of his legs. In his last job he had to drive short distances (Tr. 125-26).

The vocational expert testified that the plaintiff did not have any past relevant work at the sedentary level. The ALJ proposed the following hypothetical:

> Assume an individual of the claimant's same age, education, and work experience, limited to sedentary work, performing only occasional posturals such as climbing ramps or stairs, and balancing and stooping, but should never climb ladders, ropes or scaffolds, or kneel, or crouch or crawl; should avoid exposure to extreme cold; avoid exposure to excessive vibration, hazards, unprotected heights and driving as part of the job duties.

(Tr. 128). The vocational expert stated that the individual could perform work as information clerk, DOT of 237.367-018, sedentary, unskilled, SVP of 2, with 160,000 jobs nationally; ticket checker, DOT of 219.587-010, sedentary, unskilled, SVP of 2, with 80,000 jobs nationally; and order clerk, DOT of 209.567-014, sedentary, unskilled, SVP of 2, with 300,000 jobs nationally. The ALJ asked if the individual would not be able to stay on task for 20% of the time, would it rule out the cited jobs. The vocational expert testified that it would rule out all jobs in the state and national economy. The ALJ asked about an

11

individual that would miss four days a month of work, and the vocational expert stated that it would rule out all work (Tr. 128-29).

The attorney asked the vocational expert to assume an individual who was limited to lifting and carrying twenty pounds, could stand walk less than two hours, sit for approximately six hours, but would need to elevate his legs for fifteen minutes every thirty minutes and would need to alternate positions from sitting to standing to lying prone due to pain, swelling and stiffness. The vocational expert stated the individual would not be able to sustain substantial gainful employment (Tr. 129).

## ANALYSIS

The plaintiff first argues that the ALJ did not properly explain his findings in the residual functional capacity ("RFC") assessment (pl. brief at 13). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

The plaintiff specifically argues that the ALJ erred by giving great weight to the opinion of consultative examiner Dr. Garde yet not adopting every limitation stated in Dr. Garde's report without explaining his reasons for doing so (pl. brief at 14-17).  The ALJ gave Dr. Garde's opinion great (not controlling) weight and agreed with his opinion that the plaintiff could lift up to ten pounds, stand for two hours, walk for one hour, and sit for six hours; use public transportation; care for his own personal needs; walk without an assistive device and at a reasonable pace on rough or uneven surfaces; occasionally climb ramps or stairs, and stoop; and climb a few steps with the use of a handrail  (Tr. 20, 25-26; *see* Tr. 549-57).  The ALJ found these statements consistent with the evidence and accounted for them in assessing the plaintiff's RFC (Tr. 25-26).  Additionally, the ALJ found more significant postural limitations than Dr. Garde found and limited the plaintiff to work that does not require climbing ladders, ropes, or scaffolds or kneeling, crouching, or crawling, whereas Dr. Garde found the plaintiff could do these occasionally (Tr. 20, 555).  The ALJ also limited the plaintiff to occasional balancing, whereas Dr. Garde found he could do this continuously (Tr. 20, 555).  The ALJ also found environmental limitations not found by Dr. Garde, limiting the plaintiff to work that permits him to avoid concentrated exposure to extreme cold, excessive vibration, unprotected hazards and heights, and driving (Tr. 20).

However, the ALJ did not adopt nor mention Dr. Garde's opinion that the plaintiff could sit for at most sixty minutes at a time and stand for at most ten minutes at a time (Tr. 549, 557).  As noted by the Commissioner, Dr. Garde noted in his report that the

13

plaintiff stated he could stand for about five minutes before his hip started bothering him and could sit for about an hour at a time, and Dr. Garde substantially adopted these limitations (Tr. 549, 557).  In support of his RFC finding, the ALJ explained that physical examinations showed generally decreased range of motion in the plaintiff's hip (Tr. 25; *see* Tr. 344, 361, 376-80, 388-91, 481-82, 515-17, 551-52).  However, the plaintiff had full motor strength with no atrophy, normal joints and reflexes, normal sensation, no tenderness during musculoskeletal examination, the ability to walk with an antalgic gait at a satisfactory pace without the use of any assistive device, the ability to heel and toe walk, and the ability to squat (Tr. 26; *see* Tr. 344, 361, 376-80, 388-91, 481-82, 515-17, 550-52).  As the ALJ further noted, despite his treating physician indicating in 2009 that the plaintiff needed a total hip arthroplasty, the plaintiff, who had Medicaid coverage, had only pursued very conservative treatment (Tr. 26; *see* Tr. 118-19, 344, 388).  The ALJ also found that the plaintiff's treatment with only over-the-counter pain medication was inconsistent with the limitations he alleged  (Tr. 21, 24, 26, 27; *see* Tr. 118-19, 549). *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the plaintiff's use of "relatively mild over-the-counter medication" for joint pain supported ALJ's finding that the plaintiff's complaints were not credible.).  Moreover, the ALJ noted that the plaintiff stopped working because he was fired for reasons unrelated to his health (Tr. 25; *see* Tr. 116), and the plaintiff cared for his elderly mother, drove, shopped, cooked, cleaned, and cared for his personal needs (Tr. 27-28; *see* Tr. 119-20, 289-90, 549).  The undersigned agrees with the Commissioner that substantial evidence supports the RFC finding of the ALJ.

The plaintiff argues that if he "is limited to standing for 10 minutes at a time, [he] would not be able to complete an 8-hour workday without exceeding the amount of time that he would be able to sit in a day" (pl. brief at 16).  This argument is meritless.  "The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours . . . [and] remain in a seated position for approximately 6 hours

14

of an 8-hour workday . . . ." SSR 96–9p, 1996 WL 374185, at *6.  As noted above, Dr. Garde specifically opined that the plaintiff could stand for a total of two hours, walk for one hour, and sit for six hours in an eight-hour day (Tr. 557).  Thus, the plaintiff's argument that Dr. Garde's opinion precluded the ability to sit for six hours and stand or walk for two hours in a workday is without merit. *See, e.g., Seward v. Colvin*, No. 12-3517, 2014 WL 5797716, at *9-10 (rejecting plaintiff's argument that a 15 to 30 minute sit/stand option is inconsistent with the ability to stand or walk for no more than two hours in an eight-hour day).

The plaintiff is correct that SSR 96-9p states that the RFC assessment must be specific as to the frequency of an individual's need to alternate sitting and standing. *See* 1996 WL 374185, at *7.  However, even if the ALJ erred in failing to include an at will sit/stand option in the RFC finding and hypothetical question, any such error is harmless as the occupations that the vocational expert identified (information clerk, ticket checker, and order clerk (food beverage)) can be performed with a sit/stand option. *See, e.g., Duncan v. Colvin,* C.A. No. 2:13cv00028, 2014 WL 4955705, at *2 (W.D. Va. Oct. 1, 2014) (vocational expert testified that the job of ticket checker would be available for an individual who required a sit/stand option*); May v. Colvin*, C.A. No. 6:13-1360-TMC, 2014 WL 3809500, at *9 (D.S.C. July 30, 2014) (vocational expert testified that the job of information clerk could be performed with an "as needed" sit/stand option, and court explaining that the at will sit/stand option was sufficiently specific under SSR 96-9p); *Neal v. Astrue*, C.A. No. JKS 09-2316, 2010 WL 1759582, at *3-4 (D. Md. Apr. 29, 2010) (vocational expert testified that the job of order clerk could be performed with a sit-stand option at least every 30 minutes, and court finding that even though SSR 83-12 states that ordinarily unskilled jobs cannot be done sitting or standing at will, vocational expert testified that order clerk could be performed with sit/stand option); *Cole v. Astrue*, C.A. No. 0:08-1893-MBS, 2009 WL 2513448, at *2-3 (D.S.C. Aug. 11, 2009) (vocational expert testified that plaintiff could perform the job of order clerk if she needed a sit/stand option at will, and court finding that

15

the at-will restriction did not violate SSR 96-9p).  Thus, even if the ALJ had included a specific limitation of a sit/stand option at will, the outcome of the plaintiff's case would not change, and thus the plaintiff has failed to show harmful error.  *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles*, 29 F.3d at 921 (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

### Treating Physician

The plaintiff next argues that the ALJ failed to properly consider the opinion of his treating physician, Dr. Massie (pl. brief at 20-23).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

16

> [A] finding that a treating source medical opinion is not
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected.  Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In
> many cases, a treating source's medical opinion will be entitled
> to the greatest weight and should be adopted, even if it does
> not meet the test for controlling weight.

*Id.* at *4.

As set forth above, in December 2009, Dr. Massie opined that the plaintiff could lift up to twenty pounds occasionally and ten pounds frequently, stand/walk for less than two hours in an eight-hour day, and sit for about six hours in an eight-hour day.  The plaintiff was limited in his ability to push and pull with the lower extremities due to severe hip degenerative joint disease.  He further opined that the plaintiff would miss six to ten days of work a month, and the pain in the plaintiff's groin and leg was sufficient to affect his ability to concentrate.  Dr. Massie stated that the plaintiff would need to rest for fifteen to twenty minutes every thirty minutes, and he would need to change position as needed from sitting and/or standing to laying down.  However, Dr. Massie opined that with total hip arthroplasty the plaintiff's prognosis was "good" (Tr. 354-58).

The ALJ gave Dr. Massie's statement "little weight" as it was "inconsistent with the medical record" (Tr. 25).  In support of this finding, the ALJ noted that "[p]hysical examinations have produced relatively bland results with predominant findings of decreased range of motion of his hip"; examinations have found that the plaintiff was "neurovascularly intact" distally and had negative straight-leg rasing tests, five of five strength except for resisted hip movements that were not tested, intact sensation, wide-based gait with an antalgic gait, normal ranges of motion and strength, and no tenderness (Tr. 25).  The ALJ also cited Dr. Garde's findings of unremarkable heel-to-toe walk and

17

ability to squat, full muscle strength, no sensory loss, normal joints and reflexes, and no atrophy (Tr. 25; *see* Tr. 247-58). Additionally, the ALJ noted that the plaintiff was fired from his job for issues other than his health. Dr. Massie recommended a total hip arthroplasty, but the plaintiff, who has Medicaid coverage, had not sought such surgery; and the plaintiff had only pursued very conservative treatment – specifically over-the-counter pain medication (Tr. 25; *see* Tr. 21, 24, 26, 27). The ALJ found the foregoing evidence "consistent with the conclusion that the [plaintiff] retained an additional portion of his functionality, would not be limited regarding his ability to concentrate, and would not experience days where he would not be able to work at all due to his conditions" (Tr. 25).

The plaintiff first asserts that the ALJ erred in not reciting the entirety of Dr. Massie's opinion (pl. brief at 16). However, the undersigned finds that the ALJ's decision was sufficient as he included specific reasons for the weight given to the treating source's medical opinion supported by the evidence in the case record. *See* SSR 96-2p, 1996 WL 374188, at *5.

The plaintiff further asserts that the ALJ mischaracterized the evidence in weighing Dr. Massie's opinion (pl. brief at 20-22). Specifically, the plaintiff disputes the ALJ's statement that "physical examinations produced relatively bland results with predominant findings of decreased range of motion in the plaintiff's hip," as well as the exhibits cited by the ALJ (Tr. 25). First, the plaintiff notes that Exhibit 1F contains Dr. Massie's evaluation in which he stated that the plaintiff had significant degenerative joint disease, that the plaintiff had already reduced his activities due to pain, and that there was not much else that could be done other than total hip arthroplasty (pl. brief at 21; *see* Tr. 344). The ALJ explicitly discussed these statements (Tr. 20, 22 (noting Dr. Massie's diagnosis of "degenerative joint disease of the right hip" based on x-rays); Tr. 22, 25 (noting the need for arthroplasty and that there ""was not much that could be done other than some mild activity modifications, which he had already tried to do and had done because he was

18

hurting so bad'")).   Further, these statements are not clinical findings upon physical examination and do not contradict the ALJ's statement as to the nature of the plaintiff's physical examinations.  Moreover, with respect to Dr. Massie's diagnosis of "degenerative joint disease" based upon diagnostic testing, the ALJ explicitly relied upon this diagnosis in finding degenerative joint disease a medically determinable severe impairment at step two and in assessing the plaintiff's RFC (Tr. 20, 22; *see* Tr. 344).   However, upon establishing a medically determinable severe impairment, the plaintiff needed to prove that it resulted in work-preclusive functional limitations. *See* 20 C.F.R. §§ 404.1529(d)(4), 404.1545(a)(1), 416.929(d)(4), 416.945(a)(1) (providing that the ALJ will consider "the impact" of the claimant's medically determinable severe impairments on his ability to work); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (explaining that an impairment by itself is not necessarily disabling, but instead, "[t]here must be a showing of related functional loss"). As the ALJ found, the physical examinations and other evidence demonstrated no such disabling functional limitations.   Furthermore, Dr. Massie's examination of the plaintiff revealed that he was "neurovascularly intact distally and 2+ radial pulse," just as the ALJ cited in the decision (Tr. 22, 25; *see* Tr. 344).

    With respect to Dr. Massie's statement regarding the need for total hip arthroplasty, the ALJ specifically discussed this fact (Tr. 25), as did state agency physician Dr. Van Slooten in finding that the plaintiff could nonetheless perform a primarily sitting job (Tr. 368). As the ALJ noted, "[Dr. Massie] indicated during 2009 that the claimant needed to undergo a total hip arthroplasty; however, the claimant, who has Medicaid coverage, has not sought surgery; he has only pursued very conservative treatment, which is also inconsistent with these medical source statements (Exhibit 1F)" (Tr. 25).  As noted above, the ALJ found it important that the plaintiff took only over-the-counter medication (ibuprofen) for pain (Tr. 21, 24-27; *see* Tr. 118-19, 549).  Accordingly, the undersigned finds that the ALJ did not mischaracterize Dr. Massie's physical examination or other statements.

19

The plaintiff also asserts that the ALJ downplayed his hip's decreased range of motion as stated in Dr. Nicholson's examination, which is Exhibit 4F (pl. brief at 22).  The ALJ explicitly found that on May 17, 2010, Dr. Nicholson "assessed [the plaintiff] with bilateral hip degenerative joint disease and marked loss of range of motion of the right hip" (Tr. 22; *see* Tr. 361). The ALJ further noted:

> Dr. Nicholson also concluded that the claimant displayed signs of being in pain at 60 degrees of hip flexion and was unable to go beyond 90 degrees of hip flexion. Regarding his hip extension, he also displayed a lack of motion from 20 degrees to the neutral position. Regarding his left hip, Dr. Nicholson concluded that his motion was painful, although he displayed signs of much less restriction regarding his range of motion with moderately reduced abduction, internal and external rotation, and extension. Regarding the claimant's lumbar spine, Dr. Nicholson concluded that he displayed signs of flattened lumbar lordosis, and the claimant was unable to flex forward at the waist greater than 20 degrees with increased hip pain on the attempt.

(Tr. 22; *see* Tr. 361).  As argued by the Commissioner, the ALJ fully understood the plaintiff's hip range of motion as reported at this examination and accounted for the plaintiff's limitations in the RFC finding (Tr. 20, 21, 25).

The plaintiff further asserts that it was "unreasonable" for the ALJ to consider treatment notes "unrelated to [his] hip pain" (pl. brief at 22; *see* Tr. 23, 25-27).  The plaintiff argues that  Exhibit 7F "is in reference to . . .  blood pressure, although he reports his hip pain on the initial visit" (pl. brief at 22).  Exhibit 7F shows that the plaintiff first saw a nurse practitioner at the Community Medical Clinic of Aiken County on November 2, 2010, with "Chief Complaint[s]" of "Initial [office visit] for BP evaluation [and] [right] hip pain" (Tr. 376). As the ALJ specifically noted, on that date, the nurse practitioner performed a physical evaluation of the plaintiff and found that the plaintiff displayed signs of an unsteady gait due to hip problems (Tr. 23; *see* Tr. 376).  However, the plaintiff also displayed full (5/5) muscle strength and strong pulses in his extremities (Tr. 23; *see* Tr. 376).  As the ALJ observed,

the nurse practitioner diagnosed the plaintiff with degenerative joint disease and prescribed ibuprofen (Tr. 23; *see* Tr. 376). At the following visit, on February 1, 2011 (also in Exhibit 7F), as the ALJ noted, the nurse practitioner assessed the plaintiff with right hip degenerative joint disease (Tr. 23; *see* Tr. 377). As the ALJ further accurately explained:

> [T]he nurse concluded that the claimant displayed signs of a gait that was steady and coordinated. Additionally, the nurse concluded that the claimant displayed signs of five of five muscle strength of the bilateral extremities, strong pulses of all four of his extremities, no edema, and being alert and oriented. During the examination, the claimant reported that he had no complaints and also reported that his Ibuprofen medication treatments were "helping" his musculoskeletal pains (Exhibit 7F/3).

(Tr. 23; *see* Tr. 377).

The ALJ similarly noted that at the physical examinations on March 8, 2011, April 21, 2011, and July 21, 2011, the plaintiff had no edema, strong pulses, full muscle strength, and "no complaints" at these visits (Tr. 23; *see* Tr. 378-80). In each of these treatment notes, the nurse noted the plaintiff's "[right] hip DJD" as one of his diagnoses and listed ibuprofen under "Plan/Medications" (Tr. 378-380). Therefore, the undersigned finds that the ALJ correctly considered these treatment notes in assessing the plaintiff's hip impairment. Although other treatment notes to which the ALJ referred (Exhibits 9F/1-5, 11F/9-10, 13F/7-9) were for the plaintiff's complaints of other impairments (such as a cyst and abdominal pain), the ALJ was required to consider the entire record, including the physical findings contained within these notes (Tr. 23-24; *see* Tr. 388-91, 481-82, 515-17). As noted by the Commissioner, the plaintiff had stopped seeking any further treatment for his hip in July 2011 (through the date of the ALJ's decision in August 2013) – a more than two-year period (Tr. 30, 380). Thus, the visits for other impairments after July 2011, at which physical examinations showed no neurological deficits and normal range of motion,

normal strength, and no tenderness upon musculoskeletal examination, were reasonably considered (*see* Tr. 388-91 (March 2012), 515-17 (January 2013)).

Based upon the foregoing, the ALJ properly considered the opinion of Dr. Massie, and substantial evidence supports his findings.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 26, 2015
Greenville, South Carolina